cident, but had done nothing. The court submitted the case to the jury.

Verdict and judgment for plaintiff for $3,000. Defendant appealed.

*Error assigned* amongst others was in submitting the case to the jury.

*James A. Gardner*, city solicitor, with him *D. B. Kurtz* and *S. W. Dana*, for appellant.

*B. A. Winternitz*, with him *John G. McConahy* and *John M. Gardner*, for appellee.

PER CURIAM, November 8, 1901 :

The testimony required a submission of the case to the jury. It tended to show that the ridge of ice had existed on the sidewalk for sufficient time to imply notice to the city, even if there was not notice in fact. The plaintiff was entitled to traverse the sidewalk, using proper care in so doing, and whether he had used such care was also for the jury. We therefore dismiss the specifications of error.

Judgment affirmed.

---

## Lynch *v.* Burford, Appellant.

*Oil and gas lease—Reservation for protection against fire.*

A lessor in an oil and gas lease of five acres carved out of a large farm and " subject to a reservation of land surrounding farm buildings and marked by stakes, and as a protection against fire," has no right to drill a well on the reservation.

Argued Oct. 24, 1901. Appeal, No. 1, Oct. T., 1901, by defendant, from decree of C. P. Armstrong Co., Sept. T., 1901, No. 104, on bill in equity in case of George W. Lynch v. J. R. Burford. Before McCOLLUM, C. J., MITCHELL, DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ. Affirmed.

Bill in equity for an injunction.

PATTON, P. J., filed the following opinion:

### FINDING OF FACTS.

1. J. R. Burford is the owner of 106 acres of land in Perry Township, Armstrong county. Prior to January 25, 1899, but forty acres of this land was leased for oil purposes. This forty-acre lease was known as the Quigley lease, and is owned by Mrs. Lynch, the mother of plaintiff. It has one producing oil well upon it which is, and has been operated by the plaintiff for his mother. It is adjacent to the lease in dispute.

2. On January 25, 1899, said J. R. Burford, the defendant, agreed to lease to Geo. W. Lynch, the plaintiff, " a certain tract of land situate in aforesaid township, county and state, for the purpose of drilling and testing the same for oil, for the period of fifteen years from this date, or as long as oil is obtained in paying quantities, said lease beginning at south-west corner of farm and extending on a line with wells now producing on the Burford and Hiles farms, respectively, north-east to junction with Quigley lease on Burford farm, said lease covers ten rods on each side of line, containing five acres more or less, subject to a reservation of land surrounding farm buildings and marked by stakes, and as a protection against fire. Said second party to drill one well on this lease within ninety days from date of this lease, and if oil is obtained paying unto said first party one-eighth royalty of all oil or gas obtained on said lease. Said first party retains and reserves all rights and privileges to this property except what is necessary to drill, test and save oil or gas from this lease."

3. In pursuance to this lease, Geo. W. Lynch on April 20, 1899, began to drill a well known as Lynch well No. 1 on said five acre tract and completed the same on May 19, 1899, at a cost of $2,000. It has been pumped by him ever since and is a paying producing well. This well is about 800 feet from the reservation in the lease.

4. In the fall of 1890, Geo. W. Lynch, with the knowledge and consent of J. R. Burford located another well known as Lynch well No. 2 upon the five-acre tract. Prior to its location Burford had staked off the reservation mentioned in the lease making a circle from 195 to 200 feet around his farm buildings. This well was located one foot one inch without

the reservation, and within 195 feet and four inches of Burford barn, and about 800 feet from the Lynch well No. 1, mentioned in third paragraph of findings of fact. Lynch finished the rig to put down this well early in the fall of 1900, laid his water line, but never commenced to drill the well, alleging as an excuse that he had so much trouble with the Lynch well No. 1 that he had not time to do so. On March 27, 1901, Burford prepared two notices which he had served upon Lynch, notifying him to remove his tools and rig and not to put any more wells down upon the lease.

5. In the early part of June, 1901, J. R. Burford erected a derrick on the five-acre tract about twenty-three feet within the reservation staked off by Burford under the provisions of the lease, and twenty-four feet nearer his buildings than the Lynch well No. 2, said Lynch well No. 2 being located 195 feet four inches from Burford's barn. The Burford well is about 824 feet from the Lynch well No. 1, which is producing a small amount of oil. About June 13, 1901, Lynch learned that Burford was about to drill his well within the reservation as above described. He had graded the ground and put in part of the mud sills. On June 17, 1901, Lynch served a notice on Burford "not to drill a well or otherwise interfere with the lease on your farm containing five acres and held by George W. Lynch. Any attempt on your part to put down said well, or otherwise interfere with said lease will be met by an injunction."

Notwithstanding this notice, Burford proceeded to put down the well, and had so proceeded that he had it down between 1,400 and 1,600 feet or about 100 feet of the oil producing rock on July 29, 1901, when this injunction was granted.

### CONCLUSIONS OF LAW.

The question of law before us to decide is whether or not under the facts stated in our findings, J. R. Burford has the right to drill in a well and take out the oil upon the reservation mentioned in the lease. The question is not a new one, and leases somewhat similar have been construed by the Supreme Court.

As early as 1866 the case of Funk v. Haldeman, 53 Pa. 229, was before the court. In that case McElheny made an agree-

ment with Funk to give him the free and uninterrupted use and privilege to go on any part of the 200 acres for the purpose of prospecting, digging, etc., to find any oil, etc., and of taking the same out of the earth.

The Supreme Court in construing this agreement says: "Now although there is no express stipulation that his mining rights shall be exclusive of the grantors, is it not a fair and necessary inference from the premises? Is it conceivable that the parties meant that when, after much labor and large expenditures, Funk should strike oil, the grantors might sink wells on the adjoining acre and take not only a third of Funk's product, but all they could pump from their own wells, though they should dry up and ruin his wells altogether? If so to what end were the premises so carefully marked out and divided between the parties?"

In the case of Westmoreland, etc., Natural Gas Co. v. DeWitt, 130 Pa. 235, J. H. Brown leased to J. M. Guffey & Company, a tract of land for the sole and only purpose of drilling and operating wells, etc. No wells to be drilled within 300 yards of the brick and stone building belonging to J. H. Brown. DeWitt, the assignee of Brown began the erection of a derrick to bore for gas within 300 yards of the building, and was enjoined, Mr. Justice MITCHELL saying: "From the nature of gas and gas operations already discussed, the grant of well rights is necessarily exclusive. It was so held even as to oil wells in Funk v. Haldeman, 53 Pa. 229, 247, 248, although in that case the plaintiff had a mere license to enter, etc., and not as complainants here a lease of the land, and it is exclusive in the present case over the whole tract. As already said the clause relative to the 300 yards distance was a restriction on the privilege granted, not a reservation of any land, or any boring rights to the lessor."

In Duffield v. Hue, 136 Pa. 602, the lessee was restricted to certain sites in putting down wells, and in construing the rights of the lessees under this agreement the Supreme Court says: "The lessee however has the protection of the entire premises, and equity has jurisdiction to restrain the lessor, or others acting under him, from drilling wells thereon outside of such designated sites and thereby lessening the production of the wells

drilled by the lessee, such injury being destructive of his rights and incapable of adequate remedy.at law."

To the same effect is the case of Duffield v. Rosenzweig, 144 Pa. 520.

Taking these cases as our guide it seems clear to us that Burford has no right to drill a well on the so-called reservation against the will and protest of his lessee. From the time the lease was given, January 25, 1899, to March, 1901, when he had a difficulty with his tenant, no such a construction of the lease appears to have entered his mind. It is only after he thought that Lynch was not prosecuting the operations upon his land with due diligence that Burford undertook to increase his production by putting a well down on the reservation. Thus it appears that the parties to the contract for two years and upwards construed the contract as we now construe it. Contemporaneous construction of a contract by the parties is some help to a court in reaching a conclusion as to its true meaning.

One of the reasons given in the lease for the reservation is " a protection against fire." Could Lynch have imagined at the time he entered this contract that he could not build a derrick within 200 feet of Burford's buildings and drill a well thereon, lest it might fire his buildings, and yet Burford would have the privilege of putting up a derrick still twenty-four feet closer to his buildings and not endanger them.

Lynch has the right under the agreement to drill, test and save oil or gas from this lease. But if Burford is allowed to drill his well Lynch cannot save all his oil, for as soon as Burford begins to pump his well part of the oil within the bounds of Lynch's lease is lost to him and goes into the possession of Burford. Something evidently not contemplated by the parties at the time the contract was made.

" Said lease covers ten rods on each side of said line containing five acres more or less." This means the whole five acres. But the lessee cannot drill within a certain distance of Burford's buildings. Why? One reason given in the lease is damage from fire. Other reasons for not wanting an oil well drilled within 200 feet of your dwelling house can easily be named. Lynch under the agreement was restricted from having a well within the reservation, as was also Burford. He reserved no such rights.

We allowed some evidence to go in to show the situation of the parties with respect to the lease, and the nature of the subject-matter, and the location of the various wells, but there is no latent ambiguity in the agreement or evidence of fraud or mistake in making it, hence any parol evidence that was admitted to vary the lease, is ruled out and not considered by the court, the written contract being the agreement between the parties.

Both from reason and authority we are of the opinion that J. R. Burford, the defendant, has no legal right to drill within the reservation, and that a court of equity has authority to enjoin him from so doing, hence the injunction heretofore granted is continued.

The court subsequently filed the following opinion:

September 23, 1901, it was agreed upon the hearing that all the testimony taken in the application to continue the injunction should be considered the same as if taken in this proceeding.

Additional testimony was taken on part of the defendant for the purpose of showing that Geo. W. Lynch waived his notice of June 17, 1901, and that by his acts and declarations since the giving of the notice, has estopped himself.

The testimony relied upon was loose conversations, made with drillers and rig builders, not in the presence of the plaintiff, or communicated to him, nor is it shown that the plaintiff had any knowledge of these alleged acts or declarations or in any manner acted upon them to his detriment, or that these rig builders or well drillers were his agents in any way authorized to receive notice or waive anything. The plaintiff denies these conversations, and they are too indefinite to cause us to believe that he intended to waive his written notice of June 17, 1901.

It is true that he did, for a few minutes, work upon the rig. But this was at the solicitation of the rig builders, with whom he was upon friendly terms, as a matter of accommodation to them. It would be a harsh rule indeed to say that a party called in by his friend to give him a lift in an emergency, would by that friendly act lose his rights under his written contract.

After listening to the able argument of the learned counsel for the defendant, we see no reason for changing the conclusions heretofore reached.

And now, September 23, 1901, the opinion filed August 12, 1901, is adopted as the opinion in this hearing and the injunction heretofore granted is made perpetual.

*Error assigned* was the decree of the court.

*M. F. Leason* and *Calvin Rayburn*, for appellant.

*James H. McCain* with him *W. J. Christy*, for appellee.

PER CURIAM, November 8, 1901 :
The decree in this case is affirmed on the clear and concise opinion of the learned judge of the court below.

---

## Levin *v.* Second Avenue Traction Company, Appellant.

*Negligence—Street railways—Duty towards child of tender years.*

When a child of years so tender that negligence cannot be imputed to it, is found by a conductor or motorman on the platform of his moving street car, his duty is to remove it from its peril. This can be done by stopping the car and putting it off, or by taking it inside.

Argued Oct. 30, 1901. Appeals, Nos. 54 and 55, Oct. T., 1901, by defendant, from judgment of C. P. No. 3, Allegheny Co., Aug. T., 1898, No. 574, on verdict for plaintiff in case of Dennis Levin, by his father and next friend, John Levin and John Levin v. The Second Avenue Traction Company. Before McCOLLUM, C. J., MITCHELL, DEAN, FELL and BROWN, JJ. Affirmed.

Trespass to recover damages for personal injuries to a child five years old. See Levin v. Second Avenue Traction Company, 194 Pa. 156.

Verdict and judgment for Dennis Levin for $2,000 and for John Levin $85.00. Defendant appealed.

*Error assigned* was in submitting the case to the jury.

*Edwin W. Smith*, with him *Knox & Reed*, for appellant.